# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| STEVEN K. SPENCER, | ) | |
|     Plaintiff, | ) | |
| | ) | |
|       v. | ) | 04 C 5048 |
| | ) | |
| OFFICER JOSEPH DAWSON, et al., | ) | |
|     Defendants. | ) | |

## MEMORANDUM AND ORDER

Plaintiff Steven Spencer, who is deaf, was charged with resisting arrest and assaulting a peace officer. After he was acquitted, he filed suit against the Village of Wheeling and the Wheeling police officers who had arrested him, asserting that the officers used excessive force, violated the Fourth and Fourteenth Amendments by entering his home without a warrant, intentionally inflicted emotional distress upon him, and violated § 504 of the Rehabilitation Act, 29 U.S.C. § 794, which outlines the responsibilities of law enforcement personnel when dealing with hearing impaired individuals. The defendants' motion for summary judgment is before the court. For the following reasons, the motion is denied in part and granted in part.

## I. Background

### A. Local Rule 56

First and foremost, Local Rule 56.1 provides that "[a]bsent prior leave of Court, a movant shall not file more than 80 separately-numbered statements of undisputed material fact" and "[a]bsent prior leave of Court, a respondent to a summary judgment motion shall not file more than 40 separately-numbered statements of additional facts." The defendants' Rule 56 statement contains 247 paragraphs, which is acceptable as the court granted leave to file additional facts. Spencer, however, did not obtain permission to file a statement containing 69 additional facts.

Spencer has not attempted to explain why he ignored Rule 56.1's limits on the number of facts. In the interests of resolving the defendants' summary judgment motion in this 2004 case expeditiously, the court will not require him to redo his filing. However, it trusts that counsel will file suitably a condensed fact statement in any future cases.

Second, Local Rule 56.1(b)(3)(C) provides that "[a]ll material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." Spencer's responses to the defendants' facts frequently state that the defendants' facts are "contested" but then go on to recite additional non-responsive facts. For example, the defendants state that "Spencer was exhibiting outward signs of rage at the time that Allen Myer was removed from the trailer. (Allen Meyer Dep., 57-58)." Defendants' Facts at ¶ 46.

In response, Spencer states "Contested. Believing it was an act of ignorance and lack of sensitivity on the part of the police to take the provocative action of bringing Mr. Meyer back into the trailer and suggest using him as an interpreter escalated Spencer's emotions. (Tab 1, Spencer Dep., part I, p. [sic] 114-16; Tab 3, Aliza Meyer Dep., p. 80; Tab 10, Spencer Affidavit, ¶¶ 8-11)." This response does not match up with the defendants' proposed fact. A proper response would note whether the defendants accurately summarized Allen Myer's testimony, and would reference any additional testimony addressing whether "Spencer was exhibiting outward signs of rage at the time that Allen Myer was removed from the trailer." A so-called response which does neither of these things and, instead, delves into Spencer's thoughts at the time that Allen Myer was removed from the trailer is totally unhelpful.

Regrettably, this is far from an isolated incident as Spencer's response is rife with non-responsive responses to even the most straightforward of fact statements. The court feels compelled to note that this tactic has left it feeling like it has entered the twilight zone. To wit: the defendants state that when the police arrived, Spencer "began to pace the trailer, becoming angrier and more agitated with each passing minute," citing to a portion of Spencer's deposition where he states that he was "pacing back and forth" and felt that his emotions were escalating. Defendants' Facts at ¶ 55; Spencer Dep. at 121-122.

In response, Spencer states: "Contested. The officers went outside the trailer for 10 or 15 minutes, and Spencer's emotions were slowly escalating and his gate [sic] was increasing as time passed because he got the funny feeling that Mr. Meyer was playing the sympathy card and he was biasing the police officers with his version of things while they were out there together." This "response" is both inapposite as well as unnecessary, as the defendants' facts go on to state "While Spencer was alone in the trailer, his anger was escalating because he thought Mr. Meyer was biasing the officers with his version of what happened." Defendants' Facts at ¶ 57. To say that this "response" is unhelpful is a gross understatement. To the extent that Spencer's responses follow along these lines and fail to respond to the defendants' facts, those facts are deemed admitted to the extent that they are supported by the record.

Third, as noted by the defendants, Spencer's additional facts contain numerous "facts" that are, instead, statements of law or legal conclusions. *See, e.g.*, Plaintiff's ¶ 4 ("The section 504 regulations . . . require law-enforcement officers to provide qualified sign language interpreters for communication with persons who rely on sign language. The Department of Justice Regulations, 28 CFR part 42 states: 'a recipient that employs 15 or more persons shall

provide appropriate auxiliary aids to qualified handicapped persons with impaired sensory, manual, or speaking skills, where a refusal to make such provision would discriminatorily impair or exclude the participation of such persons in a program receiving Federal financial assistance.' (28 C.F.R. § 42.503(f).)"  This is not a fact.  The court will disregard all such "facts" as well as all legal conclusions and arguments in Spencer's submission.  Legal arguments belong in the summary judgment briefs, not the parties' fact statements.

Fourth, it is well established that a plaintiff "cannot create an issue of material fact by submitting an affidavit that contradicts an earlier deposition" unless the plaintiff demonstrates that "the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy." *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 758 (7th Cir. 2006).  The defendants assert that paragraphs 20, 24, 28, 33, 34, 35, 36, 39 and 71 of Spencer's affidavit contradict his deposition testimony, but do not provide citations to the allegedly inconsistent portions of this deposition.  The court will not attempt to hunt down the exact cites, however, as it agrees with the defendants that Spencer's affidavit goes over events which are addressed in depth in his deposition.  The court will thus not consider Spencer's affidavit because to the extent that it contradicts his deposition, it is improper, and to the extent that it does not, it is cumulative. With these caveats in mind, the following facts are drawn from the parties' Rule 56 submissions.

## B.     Facts

Although the parties have filed literally hundreds of statements of fact (and the court regrets its decision to allow facts over and beyond the number called for by the local rules), the essentials are relatively straightforward.  Plaintiff Steven Spencer is deaf and communicates

primarily through the use of sign language. He taught himself to speak and uses lipreading and body language to help him understand others. In addition, he uses a teletypewriter (TTY) device attached to his telephone.

*The Incident at the Trailer*

Spencer and his former girlfriend, Aliza Meyer, who is also deaf and communicates using sign language, co-owned a trailer home in Wheeling, Illinois.[1] On March 25, 2003, Aliza's father arrived at the trailer to speak with Spencer about selling it since Spencer and Aliza had split up. Aliza let her father in and her father ordered her to leave the trailer. Spencer used "total communication" (sign, voice, lip reading, and body language) to communicate with Meyer. The conversation rapidly deteriorated, and Spencer became agitated, began to pace, and ordered Meyer to leave.

When Meyer refused to do so, Spencer called 911 using the TTY device attached to his phone. Meyer left the trailer and also called the police, stating that someone else had reported that he was a trespasser and that he wanted to explain his side of the story. Officers Dawson and Conway arrived at the scene and observed Alan and Aliza Meyer and Joe Pinos, a male friend of Aliza's, outside the trailer.

Meyer told the officers that Aliza and Spencer were deaf and communicated using sign language (Aliza) and sign language, lip reading, and residual hearing (Spencer). He also told the officers that he could act as a translator for Spencer. Officer Conway entered the trailer while Officer Dawson interviewed Aliza and Pinos outside. Spencer was very distressed at Meyer's

---

[1] Because Aliza Meyer's father is a central figure in the events underlying Spencer's complaint, the court will refer to Aliza using her first name to avoid confusion between the two Meyers.

reappearance in the trailer and yelled that he wanted Meyer to leave. Spencer also stated that he could lip read and would resort to written notes if necessary. Due to Spencer's anger, Officer Conway and Meyer left the trailer after six to ten minutes. As they did so, Officer Conway heard thuds emanating from the trailer.

Aliza wanted to get some personal items from the trailer, so she entered the trailer in between Officers Conway and Dawson. The officers did so to effectuate a "citizen standby," where officers assist someone to get property in a potentially dangerous situation. When the officers and Aliza entered the trailer, Spencer looked extremely agitated. He was red in the face and clenched his fists as he paced back and forth. Officer Conway ordered him to stop so the officers could talk to him, and said that they would not charge Meyer with trespassing because he entered the trailer with Aliza's consent. In addition, Officer Conway explained that Aliza was going to collect some of her belongings from the trailer. The officers attempted to keep their face square with Spencer's and speak loudly and slowly so they could be understood.

Spencer began kicking walls and banging his head into the wall. Officer Conway accompanied Aliza to the bedroom while Officer Dawson stood in the hall, where Spencer was pacing. At this point, Spencer was pacing so vigorously that he walked until he hit the walls on either end of the hall, and was screaming and hitting the walls so loudly that these sounds could be heard from the outside of the trailer. While Aliza collected her belongings, Spencer punched and kicked holes into the walls of the trailer.

As Officer Conway and Aliza began to leave the bedroom, Spencer continued to pace. The parties dispute whether Spencer was pacing towards or away from Officer Conway and Aliza. However, they agree that Officer Conway grasped Spencer's arm and told him to calm

down and stop pacing. According to the officers, Spencer momentarily stopped pacing, but was still very upset and had his fists clenched. According to Spencer, he was about 6 feet away from Officer Conway and said (using his voice and sign language) "You just assaulted me!" and began storming up and down the hall again. Spencer then signed "You assaulted me! You're not helping me! Get out!" As Spencer signed, Officer Conway told him to put his hands down, and Spencer signed back "No, I have a right to sign!"

Spencer then began running into the walls at the north and south ends of the hall, kicked the walls with his boots, made more holes in the walls with his head and boots, and broke the door at the end of the hall. The officers timed Spencer's pacing to ascertain when they could get back to the bedroom where Aliza was located. They reached Aliza and exited the bedroom with her. Officer Dawson ordered Spencer to stop.

At this point, the parties' accounts diverge. According to the officers, Spencer quickly approached Officer Dawson and adopted a "fighting stance." Officer Dawson put his hand up to stop Spencer while telling Spencer to calm down, and Spencer pushed it away with his hand. Spencer then looked directly at Officer Conway and forcefully charged into him. Officer Conway pushed Spencer into the living room and away from the hall and Aliza. Spencer again said (using his voice and sign language) "You just assaulted me!" while pointing his finger in Officer Conway's face, made a fist, and cocked it back as he stood directly by Officer Conway.

When Spencer's fist went back, Officer Conway extended his baton because he thought Spencer was about to punch him in the face. It is uncontested that Officer Conway thought that Spencer was going to punch him in the face. Officer Dawson then took out his pepper spray, said, "Mike, step back, I'm going to spray him," and sprayed Spencer in the face from a distance

of about 4 feet. Wheeling police training directs officers to direct pepper spray in the face. Once Spencer was sprayed, he dropped to all fours and crawled to the bathroom while the officers escorted Aliza out of the trailer.

Spencer, unsurprisingly, has a different recollection of the events leading up to Officer Dawson's use of the pepper spray. Spencer asserts that Officer Conway grabbed him by the arm but he broke free, continued pacing, and verbally accused Officer Conway of assaulting him. Spencer then signed and stated, "You assaulted me! You're not helping me! Get out!" To sign the phrase "you assaulted me," the person signing points an index finger at the alleged assaulter and says "you," makes a fist with one hand and strikes it into the raised index finger of the other hand and says "assaulted," and finally says "me" while pointing the same index finger at himself.[2] Spencer thus asserts that he was signing when he made the gestures that the officers believed were threatening and that he did not actually threaten either officer. He also denies running into Officer Conway.

Spencer asserts that after he was pepper sprayed, the officers used excessive force on him. Spencer was eventually immobilized and removed from the trailer on a gurney. Officer Conway

---

[2] The American Sign Language Browser, http://commtechlab.msu.edu/sites/aslweb/ browser.htm, contains video clips of numerous signs, including the sign for "attack" in which "[t]he fist strikes against the forefinger. This action represents something hitting a person." This appears to be the sign at issue in this case. The court, of course, makes no finding as to whether Spencer's alleged signing matches up with the sign shown on-line. Nevertheless, the video clip of the sign for "attack" is comparable to a dictionary definition and is thus susceptible to judicial notice. *See Alexander Binzel Corp. v. Nu-Tecsys Corp.*, No. 91 C 2092, 2000 WL 310304 at *5 (N.D. Ill. Mar. 24, 2000). The court takes judicial notice of the clip as it enhances its understanding of the parties' arguments.

testified that as a result of a scuffle with Spencer after the use of the pepper spray, he suffered two herniated disks that required surgery and the insertion of two screws.

After Spencer was restrained, he contends that he pleaded with the officers to tell him what was happening but no one attempted to communicate with him. On the other hand, the officers contend that they told him that he was under arrest for assault. At all times on the day of Spencer's arrest, Officer Conway felt that he could effectively communicate with Spencer because Spencer was able to communicate without resorting to written notes.

*The Hospital*

Paramedics came to the scene to take Spencer to the hospital for a psychological evaluation because the officers believed that Spencer was behaving irrationally and had seen him running into walls. The paramedics testified that Spencer kicked and thrashed when he was placed on a gurney en route to the hospital and that he spit at the paramedics and the officers. At the hospital, someone signed into Spencer's hand to tell him that he was at the hospital. The officers, however, thought that Spencer was aware that he had been arrested and was being taken to a hospital given the overall situation.

Spencer was restrained in the emergency room for his own self-protection and was given numbing eye drops due to the use of pepper spray. There was no evidence of any permanent injury due to the use of the pepper spray. Spencer's doctor determined that Spencer was not dangerous and released him. The officers then took Spencer to the police station. Each party says they were calm and the other side was aggressive and hostile. At the station, Spencer was given a written version of his Miranda rights. Officer Dawson asserts that during Spencer's time at the station, he was verbally communicating with Spencer and Spencer was giving logical

responses so no interpreter was necessary, but Spencer contends that he needed an interpreter. However, it is uncontested that Spencer never asked for a pen and paper while at the trailer or the police station.

*Wheeling's Policies*

The Wheeling dispatcher does not send an interpreter as a matter of course in response to all calls from deaf individuals. Although Spencer contests the adequacy of Wheeling's policies, Wheeling has procedures in place for dealing with deaf individuals, such as the use of a TTY machine. If an officer believes that a sign language interpreter is needed, he or she notifies the supervisor on duty, who calls the Northern Illinois Police Alarm System ("NIPAS") to obtain one. The Wheeling Police Department social workers also have phone numbers that can be called to obtain sign language assistance.

The defendants also retained Thomas Walton, a former Deputy Chief of Patrol and Police Captain for the Chicago Police Department, to provide expert testimony regarding police procedures and training.

Since the incident with the Wheeling Police, Spencer asserts that he is reminded about the events of that day and what the police can do. He claims that his body shakes, his heart begins to pound, and his legs get shaky. The defendants, in contrast, note that Spencer has had previous altercations with various police departments. For about two months after his arrest, Spencer saw a psychologist who knows sign language, but he ultimately quit therapy because he was concerned about the cost.

In his four-count complaint, Spencer alleges that: (1) the officers violated § 1983 by using excessive force and entering his trailer without a warrant and wrongfully arresting him in

violation of the Fourth and Fourteenth Amendments; (2) the Village of Wheeling is liable under § 1983 because it failed to properly train and supervise its officers pursuant to a custom, policy, or practice of disregarding the rights of hearing-impaired residents; (3) the officers intentionally inflicted emotional distress in violation of state law; and (4) the officer and the Village of Wheeling are liable under § 504 of the Rehabilitation Act, 29 U.S.C. § 794, which outlines the responsibilities of law enforcement personnel when dealing with hearing impaired individuals, because they failed to provide him with an interpreter or communicate with him in the manner prescribed by the Rehabilitation Act.

## II.   Discussion

### A.   Standard for A Motion For Summary Judgment

Summary judgment is proper when the " pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of any material fact." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party opposing the summary judgment motion " may not rest upon the mere allegations or denials of the adverse party' s pleading"; rather, it must respond with " specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). " The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Valenti v. Qualex, Inc.*, 970 F.2d 363, 365 (7th Cir. 1992). A court should grant a motion for summary judgment only when the record shows that a reasonable jury could not find for the nonmoving party. *Id.*

### B.   Wrongful Arrest – Probable Cause

In order to succeed on a claim for unlawful arrest under 42 U.S.C. § 1983, the plaintiff must establish that he was arrested without probable cause. *Booker v. Ward*, 94 F.3d 1052, 1057 (7th Cir. 1996). Police officers have probable cause to arrest when "at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964). The probable cause test is an objective one, and once an officer establishes "cause on every element of a crime, he need not continue investigating in order to test the suspect's claim of innocence." *Kelley v. Myler*, 149 F.3d 641, 646 (7th Cir. 1998). Moreover, probable cause is an absolute defense to any claim under § 1983 against police officers for wrongful arrest. *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006).

The officers vigorously argue that probable cause existed because Spencer was punching and kicking walls, pacing vigorously and flinging himself into the walls at the end of the hallway in the trailer, and yelling and otherwise exhibiting extreme anger. They also assert that they acted properly by not calling an interpreter because Spencer was able to communicate with them since he could answer questions and never tried to resort to written communication. Finally, they stress that it is uncontested that Officer Conway thought that Spencer was about to punch him in the face.

The court disagrees with the defendants' arguments. The only thing that is truly uncontested is that Spencer was manifesting his anger by pacing vigorously in a small space, harming himself by throwing himself at the walls of the trailer, and harming the trailer by damaging the walls with his head, fists, and feet. While this is clearly not ideal behavior, the

- 12 -

defendants tacitly concede that it did not place the officers or Aliza in any danger as they stress that they had to subdue Spencer based on their perception that he was about to punch Officer Conway.

It is true that Spencer does not contest that Officer Conway thought he was about to be punched. But Spencer cannot contest Officer Conway's testimony about what the officer thought. He can and has, however, presented evidence which makes the issue of whether Officer Conway genuinely believed Spencer was about to punch him a contested fact. Specifically, according to Spencer, after Officer Conway grabbed his arm, he told Officer Conway, using his voice and sign language, "You just assaulted me!" The sign for "assault" is a fist striking against the index finger.

The jury thus will be able to choose between the defendants' version of events (Spencer made a fist and cocked it at Officer Conway's face as a prelude to punching him) or Spencer's (he made a fist as part of the sign for the word for "assault"). They may also have to determine an issue which is not presently before the court: whether Spencer's pacing and self-destructive behavior were enough, by themselves, to place the officers in reasonable apprehension of being battered. See 720 ILCS § 5/12-1. At the summary judgment stage, however, the court cannot make these determinations. Hence, it cannot find as a matter of law that probable cause supported Spencer's arrest. This means that summary judgment is denied as to Spencer's § 1983 claims against the officers.

## C.     Claims Against Officers – Qualified Immunity

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as the conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *McKinney v. Duplain*, 463 F.3d 679, 683-84 (7th Cir. 2006) (qualified immunity "shields government officials against suits arising out of their exercise of discretionary functions as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated") (internal citations and quotations omitted).

A defendant is entitled to qualified immunity unless: (1) "a constitutional right would have been violated on the facts alleged"; and (2) the right was clearly established in light of the specific context of the case (*i.e.*, whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted).  *Saucier v. Katz*, 533 U.S. 194, 20-021 (2001). Moreover, in addressing qualified immunity, the nonmovant's version of disputed facts must be taken as true.  *Payne v. Pauley*, 337 F.3d 767, 775 (7th Cir. 2003).  Finally, and most critically for the purposes of the defendants' motion for summary judgment, a police officer may act mistakenly, yet reasonably, and thus still find protection from qualified immunity, even if he lacked probable cause to effectuate an arrest.  *Anderson v. Creighton*, 483 U.S. 635 (1987).

The officers contend that even if Spencer's version of the facts is correct and they lacked probable cause to arrest him, they acted reasonably in mistaking the sign for "assault" for an impending punch because Spencer had been communicating without using sign language up to the moment that he made a fist.  The officers' position is that Spencer's sudden switch to sign language and the fact that he used a sign which included a clenched fist understandably confused

- 14 -

them and made them think he was about to punch Officer Conway.  However, the officers do not point to any authority indicating that a deaf person who communicates with sign language and his voice cannot revert to sign language when attempting to communicate with police in an emotionally-charged situation, or that the use of sign language incorporating a clenched fist is an invitation to be pepper sprayed.  *See Payne v. Pauley*, 337 F.3d 767, 779 (7th Cir. 2003) (the defendant officer's use of force in arresting a woman who was not threatening to harm the officer or anyone else at the scene, was not resisting or evading arrest, was not attempting to flee, and was charged with a minor offense, was not objectively reasonable).

The court acknowledges that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation."  *Graham v. Connor*, 490 U.S. 386, 396-97 (1989).  Nevertheless, even given this flexibility, the court cannot find as a matter of law that the officers acted reasonably as it must accept Spencer's version of the facts (*i.e.*, that he was agitated, had vented his anger inappropriately by damaging his trailer, and was trying to communicate using sign language, but did not do anything which would have caused a reasonable officer to believe that he was about to harm them or Aliza).  The court would hold otherwise if the officers' version of the facts was true (*i.e.*, that Spencer forcefully charged into Officer Conway and/or tried to punch him in the face).

The same reasoning applies to the officers' use of force after Spencer was pepper sprayed: the officers say that Spencer's actions threatened their safety and necessitated the use of pressure points and restraints, while Spencer says the officers used unnecessary force.  The court also

notes that the fact that one of the officers asserts that he sustained an injury requiring surgery due to the scuffle with Spencer does not by itself establish that the officers' use of physical force was reasonable and appropriate. Accordingly, factual disputes prevent the court from finding that the officers are entitled to qualified immunity.

### D. The Village – § 1983

To state a § 1983 claim against a municipality, a complaint must allege that a constitutional deprivation was caused by an official policy or custom. *See, e.g., Monell v. Department of Social Services of the City of N.Y.*, 436 U.S. 658, 690 (1978). Thus, a governmental entity violates § 1983: (1) if it has an express policy that, when enforced, causes constitutional deprivation; (2) if there is a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute custom or usage with the force of law; (3) if a person with final policymaking authority causes a constitutional injury. *See McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995).

The Supreme Court has recognized that a municipality may also be liable under § 1983 "if a concededly valid policy is unconstitutionally applied by a municipal employee" where "the employee has not been adequately trained and the constitutional wrong has been caused by that failure to train." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 387 (1989). To establish *Monell* liability based on evidence of inadequate training, the plaintiff must show that the municipality acted with deliberate indifference. *Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1029-30 (7th Cir. 2006), *citing City of Canton v. Harris*, 489 U.S. at 388. "This proof can take the form of either (1) failure to provide adequate training in light of foreseeable consequences; or (2) failure to act in response to repeated complaints of constitutional violations by its officers."

Here, although Spencer asserts that the Village violated § 1983 by failing to train its officers to deal appropriately with deaf individuals, his real beef is with the actions of the officers who arrested him. It is undisputed that Village policy requires an officer who believes that a sign language interpreter is needed to notify the supervisor on duty, who then calls the Northern Illinois Police Alarm System ("NIPAS") to obtain one. The record shows that the officers did not believe that an interpreter was necessary based on *Spencer's own statements*.

Specifically, the officers initially entered the trailer with Meyer so he could help them communicate with Spencer. In response, Spencer told the officers that he did not need an interpreter because he was able to communicate adequately on his own and would resort to written notes if necessary. He did not try to write a note to communicate with the officers at any point on the day of his arrest or ask the officers to write him a note. Having said that he did not need an interpreter, he cannot now contend that whatever training the officers may have had in dealing with hearing-impaired individuals was insufficient because he is dissatisfied with the way the officers ultimately interacted with him.

Therefore, this is not a situation where there was no policy in place or the policy was inadequate. Instead, the root of the problem was that the officers did not believe that an interpreter was necessary. No amount of training would have made them think otherwise, given that Spencer told them he could manage on his own and would communicate in writing if necessary. According, the Village is entitled to summary judgment as to Spencer's § 1983 claim against it.

### E.       Intentional Infliction of Emotional Distress

The defendants also seek summary judgment as to Spencer's claim of intentional infliction of emotional distress, contending that the officers' conduct was not extreme and outrageous as a matter of law.  Alternatively, they contend that even if Spencer has stated a claim for intentional infliction of emotional distress, they are immune from liability pursuant to § 2-201 of the Illinois Tort Immunity Act, 745 ILCS § 10/2-201 ("[e]xcept as otherwise provided by Statute, a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused").  In response, Spencer contends that the officers are not immune because they acted willfully and wantonly.

The court will not reach the merits because even assuming that Spencer has enough evidence to get to a jury on his intentional infliction of emotional distress claim, the defendants are immune under  Illinois law regardless of whether their actions were willful and wanton.  In this regard, the court directs the parties' attention to the Illinois Supreme Court's decision in *In re Chicago Flood Litigation*, which is not cited in any of the briefs.  In that case, the Illinois Supreme Court rejected the plaintiffs' argument that § 2-201 does not grant immunity if public officials act willfully and wantonly, explaining:

> The plain language of section 2-201 is unambiguous.  That provision does not contain an immunity exception for willful and wanton misconduct.  Where the legislature has chosen to limit an immunity to cover only negligence, it has unambiguously done so.  Since the legislature omitted such a limitation from the plain language of section 2-201, then the legislature must have intended to immunize liability for both negligence and willful and wanton misconduct. [citations omitted].  Cases holding to the contrary . . . are overruled on this point.

*In re Chicago Flood Litigation*, 176 Ill.2d 179, 195-96 (Ill. 1997); *see also Narducci v. Village of Bellwood*, 444 F.Supp.2d 924, 939 (N.D. Ill. 2006) ("the immunity bestowed by Section 2-201 is absolute" and "extend[s] even to 'willful and wanton' actions"); *Peck v. West Aurora School Dist. 129*, 2, No. 06 C 1153, 2006 WL 2579678 at *7 (N.D. Ill. Aug. 30, 2006) (under *In re Chicago Flood Litigation*, any claims based on the defendants' allegedly willful and wanton conduct are barred under § 2-201).  Because willful and wanton misconduct is within the ambit of § 2-201, the defendants are entitled to immunity.  Thus, their motion for summary judgment as to Spencer's intentional infliction of emotional distress claim is granted.

F.      **Rehabilitation Act**

The Rehabilitation Act prohibits federal grant recipients from discriminating against otherwise qualified handicapped individuals solely because of their disability.  29 U.S.C. § 794(a) ("[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance").  To state a claim under the Rehabilitation Act, the plaintiff must allege that: (1) he is a handicapped individual under the Act; (2) he is otherwise qualified for the benefit sought; (3) he was discriminated against solely by reason of his handicap; and (4) the program or activity in question receives federal financial assistance.  *Grzan v. Charter Hosp. of Northwest Indiana*, 104 F.3d 116, 199 (7th Cir. 1997).

Spencer asserts that the Village discriminated against him in violation of the Rehabilitation Act because the officers arrested him for assault when he was merely attempting to communicate using sign language.  In response, the Village claims that the Rehabilitation Act

does not apply to it because no evidence shows that it funds arrests with federal funds. The Seventh Circuit, however, has very recently held that the Rehabilitation Act applies generally to any entities which receive federal funds. *See Wisconsin Community Services, Inc. v. City of Milwaukee*, No. 04-1966, — F.3d —, 2006 WL 2729694 at *7 (7th Cir. Sept. 26, 2006). Thus, the Village's attempt to remove itself from the ambit of the Rehabilitation Act is unavailing.

The Village also argues that "Title II does not apply to an officer's on-the-street responses to reported disturbances or other similar incidents, whether or not those calls involve subjects with mental disabilities, prior to the officer's securing the scene and ensuring that there is no threat to human life." *Hainze v. Richards*, 207 F.3d 795, 801(5th Cir. 2000); *Sallenger v. City of Springfield*, No. 03-3093, 2005 WL 2001502 (C.D. Ill. Aug. 4, 2005) (surveying cases addressing the exigent circumstance exception to the Rehabilitation Act). The court will not attempt to predict what the Seventh Circuit might hold when presented with this issue as it must accept Spencer's version of events at this stage in the proceedings. Viewing the record from Spencer's perspective, there was no exigent threat to the officers or third parties because Spencer, while agitated and angry, was not threatening anyone's safety.

The court thus turns to the merits of Spencer's Rehabilitation Act claim. As noted by the defendants, federal courts recognize two types of disability discrimination claims arising out of arrests: "The first is that police wrongly arrested someone with a disability because they misperceived the effects of that disability as criminal activity. The second is that, while police properly investigated and arrested a person with a disability for a crime unrelated to that disability, they failed to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than

other arrestees." *Buchanan ex rel. Estate of Buchanan v. Maine*, 417 F. Supp. 2d 24, 72 (D. Me. 2006). If a jury accepts Spencer's version of events, it could find that the first type of discrimination occurred as Spencer claims that he was arrested and pepper sprayed for threatening an officer when he was merely attempting to communicate using sign language. *See Lewis v. Truitt*, 960 F. Supp. 175, 178-79 (S.D. Ind. 1997) (genuine issue of material fact precluded summary judgment where the deaf plaintiff presented evidence indicating that the officer arrested him because he did not respond verbally, despite the plaintiff's request to communicate in writing because he was deaf). Accordingly, the defendants' motion for summary judgment as to Spencer's Rehabilitation Act claim is denied.

## III. Conclusion

For the above reasons, the defendants' motion for summary judgment [#45] is granted in part and denied in part. Specifically, the defendants are entitled to summary judgment as to Spencer's § 1983 claims against the Village and his intentional infliction of emotional distress claims. The remainder of the defendants' motion for summary judgment is denied.

DATE: November 7, 2006

_Blanche M. Manning_
_____
Blanche M. Manning
United States District Judge